Our final case of the day is Stark v. Johnson & Johnson. Ms. Enright. Ms. Enright, you are muted. You need to unmute. Good morning. Please proceed, Ms. Enright. Good morning. I believe there are two critical issues that need to be addressed this morning concerning first, when Patty Stark knew or should have known that her injuries were wrongfully caused, and second, whether there is only one conclusion that can be drawn from the undisputed facts. Now, in addressing these two critical issues, I believe we first must look at the definition of wrongfully caused. I don't think we have to look any further than the Supreme Court in the Nolan v. John Mansville case, which was decided in 1981, that states there are two elements to be addressed in determining whether or not the injury was wrongfully caused. First was the cause. The plaintiff must have sufficient evidence that the injury was caused. And second, wrongfulness. The plaintiff must have more than a mere suspicion that the injury was wrongfully caused. So, Ms. Enright, could I ask you a question about this on the wrongfully part? Because I think that's what this case is about. I take it that your position is that the fact that mesh erosion was one of the potential adverse side effects of this product listed on all of the warnings, and she knew about it, that that alone was not enough to show that there was something defective about the product, that something more than mesh erosion had to happen. That's correct. Because she was told that that was a risk of the surgery. That was a risk and that was a known complication. So when the mesh eroded, she figured, first of all, it was her body's response because she had an underlying wound healing disease that she had her entire life. This is her Ehlers-Danlos. So when her Ehlers-Danlos, correct. So when her mesh eroded, she felt that it was her body's response to the mesh, and she also thought that this was a risk of the procedure. So she didn't think that there was anything wrong or that there was a defect from the mesh. Further, she inquired to all of her doctors as to the reasons why the surgery failed, and she was told that her wound healing disorder, the Ehlers-Danlos, could be a cause. Just like this court, or actually just like the Supreme Court ruled in the Nolan case, you know, Mr. Nolan had shortness of lung disease for 20 years. He kept going back to the doctor. And at one point, he was diagnosed with pulmonary fibrosis. And it wasn't until about 10 years later that he received a green sheet. So this is going over the course of from 1957 to 1975. He suffered from this condition and saw his doctors and asked what was going on. It wasn't until he received a green sheet from the union until he knew that his injuries were wrongfully caused by asbestos exposure. You know, there is this coming and going argument that the defense keeps bringing up. They want to deny, to this day, even in their briefs, they deny that their they want to hold her to a higher standard. She's a lay person. Can I ask you this question? I take it when she went to see her doctors, even though they used hedged language, they said could have been the Ehlers-Danlos, it could have been, you know, her body, basically, that no doctor ever said, gee, I've never seen a mesh erode this quickly or this completely, or, you know, that they, no one ever said to her anything about the product. That's correct. What they did was say, yes, it could be related to your Ehlers-Danlos. Not one doctor told her they thought it was the product itself. There was a defect of the product. So we have three board certified physicians that she went to that did not make that conclusion that there was a defect in the mesh. In fact, the doctor that originally put the mesh in, Dr. Roth, he still uses that mesh today. He doesn't feel that there is a defect with the mesh. And then she didn't have the product manufacturer ever tell her there was a defect to them in the mesh, even to this day. And your honor, I believe the facts are also on all fours with the case that this quarter specifically has knowledge of, and that's in the Abisher case that was decided versus Stryker, that was decided in 2008, where we have a plaintiff where the court held that due to the factual circumstances, it was a question of fact for the jury as to when Ms. Abisher knew that her defect was wrongfully caused. She had an implant that was a hip implant. And just like in Stark, before the surgery, her doctor said, you know what, erosion, failure of this implant, those are risks of the procedure. So when, and they also said, because of the fact that you're young and that you're active, you could have to have another surgery and this implant can loosen. So when her implant, in fact, loosened, and in fact, when she was told she needed to have the product removed and have another surgery, she felt it was her body's response, just like Patty Stark, but it was her body's response. They both had alternate causes. In Abisher, the alternate cause was her body, her activeness, her, she had an osteolysis that is where her tissues and eroded into the bone. She had no idea that it was the Stryker implant that was the problem, just like- Can I interrupt you for a moment here and just ask you, is Ms. Stark a party to the multi-district litigation? No. And how, why not? How did this wind up staying in Illinois? Due to the different procedural aspects of the case, it was not ever part of, there was a conscious choice that was made. It was never part of the MDL. Okay. And in looking at the case law there, the Southern District of West Virginia has issued all these decisions under all these different state laws. Are there, is there other appellate law in the federal courts dealing with these pelvic mesh products on statute of limitations? There are, but they're not applying to just one case. They apply to courts that have an alternate cause. Any case that has an alternate cause, they have alternative cause, they have, the courts have ruled that it's a question of fact because all the circumstances need to be looked at. Okay, thank you. I believe I'd like to reserve, I think I would like to reserve my remaining time for rebuttal. Thank you. Certainly, Ms. Henright. Ms. Pepke. Good morning. May it please the court, my name is Amy Pepke and I represent the appellees Johnson and Johnson and Ethicon. Plaintiff's argument today for reversal suffers from at least two flaws and they are critical flaws. First, she continues to misapprehend the discovery rule in Illinois, urging this court to require some type of notice of defect before the statute of and the Illinois courts, the Illinois Supreme Court and even this court has recognized that's a concept that is not part of the discovery rule. Second, plaintiff fails to appreciate the very unique nature of the injury in this case where implanted mesh has migrated where it should not be in her body, it has eroded, it has dissected her urethra twice with the erosion in 2015 being inoperable, it is unable to be removed. May I ask you Ms. Pepke, I mean those are of course are all awful things, but let me give you an analogy. Some people who have diabetes because of the nature of diabetes have problems, their wounds don't heal the way a normal person's wounds would heal and that's true permanently. That's just a condition of diabetes which people don't recover from and she's roughly saying that the same thing is that she was led to believe the same thing was true for her. She's got this Ehlers-Danlos syndrome, her tissues don't behave the way a normal person's tissues behave, so it's not that she doesn't know that the product is defective, but she doesn't even have any reason given the advice she's received from physicians to believe that the of another as opposed to her own body's vulnerabilities, I'll say. And I know you were in a difficult position because obviously I'm sure if push came to shove, J&J would be here on the merits arguing there was nothing wrong with the mesh. Fine, we'll put that to one side. We're just here about whether she had any reason to think that the injuries she was experiencing from the mesh were wrongful. In other words, was it doing something more than was predicted or were they just risks that she had undertaken when she gave her consent for the surgeries? Your Honor, you've cut right to the chase and so yes, almost every plaintiff will have some kind of comorbidity here. So diabetes, smoking, even the Ehlers-Danlos syndrome. Dr. Follett has recognized that all of those could be contributing factors and here's the key. None of those are alternative causes of this injury. Her injuries don't, can't occur organically like in Nolan with the lung disease, which could be organic or in Lamanna. I don't understand because it's an interaction. I mean, she has this condition and you put the mesh in and so for people with this Now obviously if no one ever put the mesh in, she wasn't going to experience the dissection, which is a polite term for the tearing apart of her urethra, etc. But I don't know that you can assume away the fact that she agrees based on the information she's given to the surgery and she thinks that the reason she's having such phenomenally adverse effects from it has nothing to do with the quality of the product. It has only to do with her own body's vulnerabilities. Well, Your Honor, I think we have to go back to two things. First, we go back to the standard to be applied and the notice we're looking at, the notice inquiry that we're looking at, is whether she is on notice of any actionable conduct, not whether the mesh was defective. No, you're omitting the word that the injury was caused by the wrongful acts of another. I would say a company selling a medical device that performs exactly as depicted on the inserts and in the material given to the FDA hasn't done anything wrongful. But if the device is actually defective beyond that, that's where you begin to have the problems. Well, Your Honor, the Illinois Supreme Court has defined wrongfully caused. And the way that they define wrongfully caused is we know that it is when plaintiff has sufficient information concerning the injury and its cause to put a reasonable person on inquiry notice to determine whether any actionable conduct was involved. And that means as to any defendant for any cause. So that could be actionable conduct towards her doctors for implanting the device. It could be the manufacturer for making the device. But I think if we look at... Ms. Bepke, what do you make then of the fact that what Ms. Stark was experiencing was in the list of known complications, that none of her doctors signaled that there was anything wrongful or even to be suspicious about. And so she's got this, she's got the confounding EDS condition, and she's got these known complications. Sometimes devices don't work, surgery doesn't work. Why is that enough to say you've got to start talking to lawyers? There's a two-part answer to that question, Your Honor. First, in the withdrawal case, which is the Illinois Supreme Court case, the birth control case, the court points to the IFE or the label warning in that case and says, hey, the warning in this case relates birth control to the possibility of blood clots in your leg. And the court says that is notice. That is notice that birth control is linked to blood clots. And in that case, the plaintiff was also told by her mother that birth control can be linked to blood clots. And the Illinois Supreme Court says that's enough to link, to put you on notice. But in this case, it goes further than what she was told. So when she sees Dr. Elser in 2008, Dr. Elser does tell her, hey, mesh can cause erosion. It can cause erosion even if you don't have complicating factors such as EDS or diabetes and smoking. And Ms. Stark signs the consent form that, yes, it can cause erosion. But when we get to 2015 with Dr. Villates, much more than that has happened. In 2015, and this is where the crux of the answer to the question is, if we look at plaintiff's claim, failure to warn claim, it rests on the fact that she says that no one warned her about the possibility of multiple surgeries, the possibility that mesh could not be removed from her body, and that it could be permanently eroded, permanently disfiguring her. She says she has no warning of that. So in 2015, when she wakes up from surgery and Dr. Villates tells her, I am sorry, this mesh is permanently embedded in your body. It has dissected your urethra, and it cannot be removed. She is on inquiry notice to determine what went wrong, because clearly she actually has actual notice that something went wrong. She didn't get a warning. Now, it might be that she inquires whether it was her doctor who didn't warn her or the manufacturer who didn't warn her, which is what her allegation is. And also, she's on duty to inquire whether, in fact, it's her surgeon that implanted her with this product when she had EDS. But at that moment, she has had a traumatic event. And Illinois courts, and even this court, has recognized that when you have an injury that looks more like a traumatic event than an organic event, for example, the organic events being things like infection, kidney disease, and these are stuff that happened in the Nolan case, in the LaManna case, the Roper case, the Smith case, you know, we set those aside because they can have multiple etiologies, true alternate causes. But when you have a traumatic injury, and that's what we have here in 2015, when she wakes up from surgery, and she's told that the mesh is permanently in her body, it cannot be removed, her urethra has been dissected, and that's it. It can't be removed, and she's had no notice of that. We're looking at a traumatic injury. And what the Illinois courts have said about that is a traumatic event alone puts plaintiff on notice of a reasonable possibility that injury was wrongfully caused. And, Your Honor, this court... in which the Illinois Court of Appeals, in which the plaintiff actually underwent a surgery and woke up in the ICU, unexpectedly. And in the ICU, she finds out she has these complications, and she has sepsis, and the court says, that's it. When you woke up, and these things happen, and they weren't expected, you're on notice. And, Your Honor... But you said something critical. They weren't expected. And her position has been that all of the things that happened to her were within the scope of the warnings for the device. So they were expected. That is actually, Your Honor, I respectfully disagree. Her expert report, Dr. Blavis, which is part of the record, specifically says that that is part of their claim, that the warnings do not include, do not address the management of complications, the need for multiple surgeries, or the difficulty and the risk involving attempting to remove the TBTO. It's also in her complaint, which is docket 34, paragraph 42. Her claims, and which we take as true, is that she was not warned that it could not be removed from her body, and it would be a permanent disfigurement. And I see I'm out of time, Your Honor. Thank you, Ms. Pecky. Anything further, Ms. Enright? In response, I believe the court correctly pointed out that the word wrongful is left out of defendant's argument on several occasions. Just like the fact that counsel said, well, we need to just set aside all these cases, anything that has an organic nature as an alternative cause. That's exactly what Patty Stark's case is. This wound healing disease is an organic. It's not just some comorbidity. It's what disables her body and her tissues from healing. Now, there's nothing wrongful about erosion. There's nothing wrongful about inflammation. There's nothing wrongful about pain. These are the risks that she took when she had the surgery. These were known risks that were discussed with her and her doctors. Therefore, when she woke up from surgery in 2015, she didn't feel that this was some sudden traumatic event. It was the exact same what happened in 2008 in that her surgery failed. And when asked in her deposition why her surgery failed, she said, I thought it was my body's response and not at any time did Johnson & Johnson or any of her three board certified physicians ever tell her there was a defect with the product. Thank you very much, counsel. The case is taken under advisement and the court will be in recess.